**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **NO.  23-CR-288(BAH)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH PASTUCCI** | : | |
| **JEANETTE MANGIA** | : | |
| **Defendants** | : | |

**DEFENDANTS' JOINT MOTION TO DISMISS COUNTS ONE, TWO, FOUR, FIVE, SIX, SEVEN, EIGHT, NINE, TEN, AND ELEVEN OF THE INDICTMENT WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES**

The defendants, Joseph Pastucci and Jeanette Mangia, jointly file this motion to dismiss counts 1, 2, 4, 5, 6, 7, 8, 9, 10, and 11 of the Indictment filed on August 25, 2023 (*See* ECF No. 16), pursuant to Fed. R. Crim. P. 12(b). For the reasons discussed below, these counts fail to state an offense and fail to give proper notice to the defendants.

**BACKGROUND**

Mr. Pastucci and Ms. Mangia are charged in Counts 1, 2, 4, 5, 6, 7, 8, 9, 10, and 11 with violations of:

Count 1 – 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding)

Count 2 – 21 U.S.C. § 231(a)(3) – (Civil Disorder)

Count 4 – 18 U.S.C. § 1752(a)(1) (Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority)

Count 5 – 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds)

Count 6 – 18 U.S.C. § 1752(a)(4) (Engaging in Physical Violence in a Restricted Building or Grounds)

Count 7 – 40 U.S.C. § 5104 (e)(2)(A) (Entering and Remaining on the Floor of Congress)

1

Count 8 – 40 U.S.C. § 5104 (e)(2)(C) (Entering and Remaining in Certain Rooms in the Capitol Building)

Count 9 – 40 U.S.C. § 5104 (e)(2)(D) (Disorderly Conduct in a Capitol Building)

Count 10 – 40 U.S.C. § 5104 (e)(2)(F) (Engaging in an Act of Physical Violence in the Capitol Grounds or Buildings)

Count 11 – 40 U.S.C. § 5104 (e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building)

A stipulated bench trial is scheduled for April 26, 2024.

## STANDARDS OF REVIEW

### I.      Motion to Dismiss

An Indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)). A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Rule 12 provides that a defendant may also move to dismiss the Indictment for "failure to state an offense" and "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).

### II.     Statutory Interpretation

To determine the legislative intent of a law, courts "always [. . .] begin with the text of the statute." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013). "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according

to its terms." *United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917) (internal quotes omitted)). "The search for the meaning of the statute must also include an examination of the statute's context and history." *Hite*, 769 F.3d at 1160 (citing *Bailey v. United States*, 516 U.S. 137, 144-45 (1995)). Importantly, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

### III.   Vagueness

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997). The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

### IV.   The Rule of Lenity

The rule of lenity applies if the terms of the statute are ambiguous; once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992). This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)). The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id.* (citing *Moskal v. United States*,

498 U.S. 103, 108 (1990)). "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words. Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole. *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

### V.      The First Amendment

Government regulation of expressive conduct protected by the First Amendment is only justified if "the regulation is within the constitutional power of the Government; if it furthers an important or substantial governmental interests; if the government interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

### VI.     The Fifth Amendment

Lastly, the Double Jeopardy Clause of the Constitution protects against "multiple punishments for the same offense." *Weathers*, 186 F.3d at 951, cert. denied, 529 U.S. 1005 (2000); U.S. Const. amend. V, cl. 2. When two different criminal statutes are violated, "the double jeopardy prohibition is implicated when both statutes prohibit the same offense or when one offense is a lesser included offense of the other." *Rutledge v. United States,* 517 U.S. 292, 297 (1996)).

Under the foregoing legal authority, counts 1, 2, 4, 5, 6, 7, 8, 9, 10, and 11 of the Indictment should be dismissed by the Court.

### ARGUMENT

### I.      18 U.S.C. § 1512(c)(2) as Alleged in the Indictment Fails to State an Offense

The indictment alleges that the defendants "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's

certification of the Electoral College vote" in violation 18 U.S.C. § 1512(c)(2). ECF No. 16 at 2. These charges ignore congressional intent and statutory construction of § 1512(c)(2) and are unconstitutionally vague as applied to the defendants here.

### a. Congressional Intent and Statutory Construction of 18 U.S.C. § 1512(c)(2)

Analyzing the congressional intent and plain meaning of the statute, it is clear that 18 U.S.C. § 1512(c)(2)'s purpose is to protect the integrity of hearings before tribunals by preventing witness tampering and destruction of evidence.

18 U.S.C. § 1512(c) provides: "Whoever corruptly –

> (1) Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) Otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so…shall be fined….or imprisoned…

§ 1512(c). In turn, an "official proceeding" is defined as –

> (1) A proceeding before a judge or court of the United States, a United states magistrate judge, bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (2) A proceeding before the Congress;
>
> (3) A proceeding before a Federal Government agency which is authorized by law; or
>
> (4) A proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

§ 1515(a)(1).

18 U.S.C. § 1512(c) was enacted as part of the Sarbanes-Oxley Act of 2002, which is titled "Corporate Fraud Accountability," and targets "corporate malfeasance." Pub.L. No. 107-204, 116 Stat. 745. Sarbanes-Oxley was designed to "protect investors and restore trust in financial markets following the collapse of the Enron Corporation" after revelations that Enron's outside auditor had

"systematically destroyed potentially incriminating documents." *Yates v. United States*, 574 U.S. 528, 532 (2015). In *Yates*, the Supreme Court narrowly interpreted the term "tangible object" in § 1519 in keeping with the specific context and purpose of Sarbanes-Oxley.[1] Recognizing that, in the Sarbanes-Oxley legislation, "Congress trained its attention on corporate and accounting deception and cover-ups." *Id.* at 532. The Supreme Court held that the Act did not contemplate penalizing the act of tossing undersized fish overboard to avoid the consequences of an inspection by federal authorities. *See id.* Rather, in the context of the statute's purpose, a "tangible object' must be one used to record or preserve information." *Id.* So while fish are tangible objects in the ordinary sense of that phrase, they do not qualify as tangible objects for purposes of § 1519.

In an amendment to § 1512, the Sarbanes-Oxley Act added the current subsection (c)(2), which penalizes corruptly obstructing, influencing, or impeding "any official proceeding." The term "official proceeding" is defined in § 1515 to include a proceeding "before a judge or court of the United States" and a proceeding "before the Congress." Like the phrase "tangible objects" in § 1519, the phrase "official proceeding" in § 1512 requires interpretation.

"Dictionary definitions of the term 'proceeding' alone…cannot conclusively resolve" whether a proceeding is an "official proceeding" under § 1512. *United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013). Further, courts have interpreted "official proceeding" to imply something formal. *See, e.g., United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106; *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation

---

[1] 18 U.S.C. § 1519 provides: [w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States…..

conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because the term encompasses "events that are best thought of as hearings (or something akin to hearings)"). As with the phrase "tangible object" in § 1519, the phrase "official proceeding" must be interpreted in light of the statute's express purpose, which is "to enhance and protect the necessary role of crime victims and witnesses in the criminal justice process." *United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008).

In the context of this "witness tampering" statute, an "official proceeding before the Congress" is logically limited to the same type of "adversarial nature" as court proceedings where there is a potential for witnesses to be influenced or documents destroyed. *See* S.Rep. No. 107-146, at *6 (2002). Not only must "the charged conduct have some reasonable nexus to a record, document or tangible object," *United States v. Singleton*, 2006 WL 1984467 *3 (S.D. Tex. 2006), or to witness testimony, *United States v. Kumar*, 617 F.3d 612, 619-20 (2d Cir. 2010), but the obstruction must concern a proceeding involving adjudicative or at least "quasi-adjudicative responsibilities." *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009).

In *Ermoian*, for example, the Ninth Circuit held that an "official proceeding" suggests a "formal appearance before a tribunal;" an FBI field investigation did not qualify. 752 F.3d at 1170-71. "[W]hen examining the term 'proceeding' within the grammatical structure of the definition at issue, it becomes clear that the term connotes some type of formal hearing." *Id.* The court focused on the contextual language that § 1512 uses when referring to "official proceeding" explaining that § 1512 refers to "preventing the attendance or testimony of any person"; "preventing the production of a record, document, or other object, in an official proceeding; and being absent from an official proceeding to which that person has been summoned by legal process." *Id.* at 1171-1172. It was important to the court that the statute used the words, "testimony," "attendance," "production," and "summons," all of which "strongly implies a hearing before a formal tribunal." *Id.* at 1172. *Accord United States v.*

*McDaniel*, 2014 WL 2084891 (N.D. Georgia 2014) ("official proceeding" for purposes of §1512(c) did not include an FBI investigation); *with Sutherland*, 921 F.3d at 426 (the term "proceeding" implies 'some formal convocation….in which parties are directed to appear") (quoting *United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019)).

### b. The Electoral Count on January 6 Was Not an "Official Proceeding"

When considering the legislative history of 18 U.S.C. § 1512 and Congress's role in counting electoral votes pursuant to the 12th Amendment and the Electoral Count Act of 1887, later codified in 3 U.S.C. § 15, the electoral count is clearly a ceremonial and administrative event that does not qualify as an "official proceeding." The Twelfth Amendment and the Electoral Count Act of 1887 place the responsibility on Congress to count electoral votes after the states have already heard any disputes and certified the vote. *Bush v. Gore*, 531 U.S. 98, 154 (2000) (Breyer, J., dissenting). Members of Congress may make an objection, in writing, and without argument. 3 U.S.C. § 15. According to the statute, there is no testimony, no witnesses, no argument, and no evidence. *Id.* Given this, an electoral count is simply not an adjudicative proceeding of the type that falls within the ambit of a witness tampering statute such as 18 U.S.C. § 1512(c)(2).

The purpose of the Electoral Count Act of 1887 was to resolve years of confusion as to what exactly Congress's role was in counting the electoral votes. The seven sections of the Act attempt to do five things:

(1) Give the states enough time between election day and elector balloting day to settle controversies over the appointment of their presidential electors (Section 1);

(2) Encourage the states to establish mechanisms for resolving contests over the appointment of presidential electors prior to the day of electoral balloting (Section 2);

(3) Publicize and place on the record the states' determination of the outcome of their electoral appointment process (Section 3)'

(4) Minimize congressional involvement in resolving controversies over elector appointment not authoritatively resolved by the states (Section 4);

(5) Settle procedural issues for conducting the joint session at which Congress counts the states' electoral votes (Sections 4-7).[2]

The sponsors of the Electoral Count Act hoped that "if the disputes touching the Constitution of the Electoral Colleges in the States could be disposed of in advance of their action, the counting of the electoral votes at the seat of government…would be usually a little more than a formal ceremony."[3] Section 5 of the Act provides that the "State's selection of electors "*shall be conclusive*, and shall govern in the counting of the electoral votes" if the procedural rules have been followed. *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, J., concurrence) (emphasis added). Thus, the legislative history of the Act demonstrates that Congress's Electoral Count is intended to be a "ceremonial" finalization and recording of the votes that have already been certified by the states. So while Congress is in session on January 6, it is not an "official proceeding" for purposes of § 18 U.S.C. 1512(c) and 1515(b).

Count One of the Indictment, which charges that Mr. Pastucci and Ms. Mangia intended to "impede or influence" Congress's certification of the Electoral College vote, is based on the belief that the "ceremonial" vote count is an "official proceeding" for purposes of 18 U.S.C. § 1512(c). However, as outlined by the legislative history and purpose of the Electoral Act of 1887, "obstruction of an official proceeding before Congress" was never intended to apply to an event, like the vote count, that involves no witness testimony, documentary or tangible evidence, or meaningful adjudication. Many congressional hearings *do* involve witness testimony and documentary evidence and allow Congress to exercise their investigatory power. In those instances, § 1512(c) protects the integrity of witness testimony and evidence. *See generally United States v. Poindexter*, 951 F.2d 369, 382 (D.C. Cir. 1991) (discussing how the Victim and Witness Protection Act of 1982 created a new

---

[2] Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLLR 541, 578 (2004).

[3] Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLLR 541, 585 (2004) (quoting Senator George Edmunds in H.R. Misc. Doc. No. 44-13 at 18).

provision, § 1512, which prohibits various forms of witness tampering). By contrast, Congress's counting of the Electoral College votes is not an adjudicative proceeding; Congress was merely tasked the ceremonial and administrative task of confirming the requirements for certification have been followed *after* the states previously have determined that the votes were lawfully certified.

This administrative and ceremonial proceeding is not the target of § 1512(c) and the government cannot conveniently group the unique tradition of the Electoral Count with every other Congressional hearing as they are completely different and possess different functions and characteristics. The government also cannot ignore years of precedent and legislative history plainly demonstrating that 18 U.S.C. § 1512(c)(2) is limited to adjudicative hearings where there is a potential for destruction of documents and witness tampering.

### c. Even if the Court Determines that the Electoral Count is an "Official Proceeding," 18 U.S.C. § 1512(C)(2) is Unconstitutionally Vague

Under the same principles of *United States v. Johnson*, 576 U.S. 591 (2015) and its progeny, 18 U.S.C. § 1512(c)(2) violates due process as it is vague and does not provide fair notice to Mr. Pastucci and Ms. Mangia as to the conduct it punishes. The statute provides that:

"Whoever *corruptly* –

> 1. Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> 2. *Otherwise obstructs, influences, or impedes any official proceeding*, or attempts to do so…shall be fine….or imprisoned…

18 U.S.C. § 1512(c)(1)(2) (emphasis added). Section 1512(c)(2) uses words throughout both sections that require courts–and anyone reading the statute–to speculate as to their meaning in the context of a defendant's particular actions. Courts must speculate as to the meaning of the word "corruptly" acted and the phrase "official proceeding." Even more problematic is that subsection (c)(2) is a "residual clause," one that is ambiguous and requires courts to determine exactly what line must be

drawn in determining if a defendant is otherwise obstructing, impeding, or influencing an official proceeding before Congress.

In *Johnson*, the Supreme Court explained that "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." 576 U.S. at 597. There, the Court found a due process violation where a defendant's sentence was enhanced by the residual clause in the Armed Career Criminal Act if the prior felony "involved conduct that presented a serious potential risk of physical injury to another." *Id.* at 591. The residual clause violated due process because it required speculation in each case as to what could potentially cause injury in each set of circumstances. *Id.* at 598. The resulting ambiguity caused a wide range of interpretation and disparity among courts over the course of nine years and the Court acknowledged that the "failure of persistent efforts to establish a standard can provide evidence of vagueness." *Id.*

Similarly, the discussion above regarding what constitutes an "official proceeding" illustrates just part of the confusion and lack of cohesiveness among jurisdictions as to what does or does not qualify as an "official proceeding" under § 1512(c)(2). In each case, the courts have had to speculate and attempt to distinguish "official proceedings" from other proceedings or investigations. While, as discussed above, courts have interpreted "official proceeding" to mean something more than an investigation and something more formal, there is no established standard, leaving ambiguity among the courts. *See United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006); *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019); *United States v. McDaniel*, 2014 WL 2084891 (N.D. Georgia 2014).

The vagueness of § 1512(c)(2) is not limited to the confusion surrounding what constitutes an "official proceeding." The D.C. Circuit has acknowledged that the word "corruptly" is vague on its face as used in a similar statute, 18 U.S.C. § 1505, that prohibits obstruction of a proceeding before

departments, agencies or congressional investigations. The court held that "in the absence of some narrowing gloss, people must guess at its meaning and application." *United States v. Poindexter*, 951 F.2d 369, 398 (D.C. Cir. 1991). Previously, in *Ricks v. District of Columbia*, 414 F.2d 1097 (D.C. Cir. 1968), the court held a statute that criminalized "leading an immoral or profligate life" vague because it found "immoral" to be synonymous with "corrupt, depraved, indecent, dissolute, all of which would result in "an almost boundless area for the individual assessment of another's behavior." *Poindexter*, 951 F.2d. at 399 (quoting *Ricks*, 414 F.2d at 1097). The court explained that various dictionary definitions of the word "corrupt" did not reduce the confusion as to its meaning for purposes of the statute. *Id.* After an assessment of the legislative history and judicial interpretation, the court concluded that neither of those inquiries provided defendants with the constitutionally required notice that the statute requires and found the term vague as applied to the defendant making false statements. *Id.* at 406.

Following *Poindexter*, Congress amended § 1515 to define "corruptly" for purposes of § 1505 only to mean "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." § 1515(b). However, this amendment did not resolve the vagueness that still exists in § 1512 as Congress did not amend § 1515 as it applies to § 1512.

Even though the D.C. Circuit later held that the word "corruptly" was not vague as applied, it was because in that case the defendant influenced a witness which fit squarely within the non-vague category that *Poindexter* established. *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996). In *Morrison*, the defendant tried to influence a witness's testimony and "exhorted her to violate her legal duty to testify truthfully in court." *Id.* The Court in *Poindexter* explained that influencing another to "violate their legal duty" was not vague because "it would both take account of the context in which the term "corruptly" appears and avoid the vagueness inherent in words like "immorally." *Poindexter*, 951 F.2d at 379. However, the *Morrison* Court was not faced with the question of what "corruptly"

means in the context of Section 1512(c) and does not resolve the ambiguity that the word presents in conjunction with the rest of the statute. The phrase "corruptly influences" does not resolve the ambiguity because "influence" alone is another vague word that may mean many things and lacks the definiteness of "influencing another to violate their legal duty" stated in § 1515. The various meanings of the word "influence" also support the inherent vagueness that exists in the statute especially within the context of January 6, 2021. Many individuals who were there and not charged with obstruction were there to protest the vote and hoped that their voices would be heard, just like thousands of protests that have taken place in this country. So, in a sense, that is a type of intended "influence," but it cannot be the intention of Congress to criminalize the right to peacefully protest to effect change. There must be something more, such as physically doing something to influence a proceeding, which is not captured by the statute because it simply says "influence."[4]

As applied to this case, it is unconstitutionally vague as to which actions by Mr. Pastucci and Ms. Mangia as alleged in the indictment amount to an attempt to "influence" what occurred on January 6, 2021.

### d.  The Supreme Court is Poised Clarify the Meaning of § 1512(c)(2)

In contrast to the arguments set forth here, the District of Columbia Circuit Court of Appeals recently found that "§ 1512(c)(2) applies to all forms of corrupt obstruction of an official proceeding." *United States v. Fischer*, 64 F.4th 329, 336 (D.C. Cir. 2023), *cert. granted*, No. 23-5572, 2023 WL 8605748 (U.S. Dec. 13, 2023). The Court of Appeals acknowledged that "outside of the January 6 cases brought in this jurisdiction, there is no precedent for using § 1512(c)(2) to prosecute the type of conduct at issue in this case." *Id.* at 339. The Court of Appeals found "'corrupt' intent exists at least when an

---

[4] *See* Merriam-Webster (2021) defining influence as "the power to change or affect someone or something: the power to cause changes without directly forcing them to happen," "to affect or alter by indirect or intangible means," or "to have an effect on the condition or development of."

obstructive action is independently unlawful[.]" *Id.* at 340. And the Court ultimately found that §

1512(c)(2) is not unconstitutionally vague and that the election certification was an official proceeding.

*See id.* at 342. However, as certiorari has been granted in *Fischer*,[5] Defendants reserve their above

arguments until the Supreme Court issues its opinion on the case.   Under Rule 10 of the Supreme

Court rules, certiorari is granted in the following situations:

> (a) a United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals on the same important matter; has decided an important federal question in a way that conflicts with a decision by a state court of last resort; or has so far departed from the accepted and usual course of judicial proceedings, or sanctioned such a departure by a lower court, as to call for an exercise of this Court's supervisory power;
>
> (b) a state court of last resort has decided an important federal question in a way that conflicts with the decision of another state court of last resort or of a United States court of appeals;
>
> (c) a state court or a United States court of appeals has decided an important question of federal law that has not been, but should be, settled by this Court, or has decided an important federal question in a way that conflicts with relevant decisions of this Court.

U.S. Sup. Ct. R. 10. Based on this rule, Defendant's expect that the Supreme Court's decision in *Fischer*

will affect their arguments relating to § 1512(c)(2): affirmation of *Fischer* would defeat many of the

above arguments, but reversal would likely support one or more of the above arguments in favor of

dismissal. *See United States v. Adams*, No. 21-CR-354 (APM), 2024 WL 111802, at *2 (D.D.C. Jan. 10,

2024) (finding that "it takes four justices to grant certiorari and, although this court will not attempt

to read tea leaves, the Supreme Court's decision to review *Fischer* means, at a minimum, that this case

poses a 'close question.'"); *but* see *United States v. Chilcoat*, No. CR 22-299 (CKK), 2024 WL 148967, at

*6 (D.D.C. Jan. 12, 2024) (finding that when "the Supreme Court decided to grant certiorari does not

mean that those cases were wrongly decided."); *see also United States v. John George Todd III*, No. CR 22-

166 (BAH), 2024 WL 307390, at *2 (D.D.C. Jan. 27, 2024) ("Although the Supreme Court has granted

certiorari in *Fischer*, the law of this Circuit remains reflected in *Fischer* and *Robertson*."). In *Robertson*, the

---

[5] *Fischer v. United States*, No. 23-5572, 2023 WL 8605748, at *1 (U.S. Dec. 13, 2023).

Court of Appeals found that "'corruptly' must be construed according to its plain meaning; that the 'corruptly' element in § 1512(c)(2) delineates whether a defendant's conduct is culpable; and that there are a range of ways to prove a defendant's 'corruptly' intent or action." *United States v. Robertson*, 86 F.4th 355, 364 (D.C. Cir. 2023). But the Supreme Court ruling in *Fischer* will likely clarify the proper scope of "corruptly" in § 1512(c)(2).

## II.      Section 231(a)(3) is Unconstitutionally Vague and Fails to Provide Sufficient Notice

A criminal statute is void for vagueness when it (1) "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden," *United States v. Harriss*, 347 U.S. 612, 617 (1954); or (2) "encourages arbitrary and erratic arrests and convictions." *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972). For two additional reasons, § 231(a)(3) is subject to a particularly high level of scrutiny under this test. First, it imposes criminal penalties, and "[c]riminal statutes must be scrutinized with particular care" under the vagueness test. *City of Houston v. Hill*, 482 U.S. 451, 459 (1987*)*. Second, it threatens to interfere with First Amendment rights, which means "a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

### a.  The Statute's Imprecise Language Improperly Hinders a Person of Ordinary Intelligence from Discerning What Conduct It Prohibits

Ordinary citizens are entitled to "be informed as to what the State commands or forbids." *Papachristou*, 405 U.S. at 162 (citing *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939). Here, a person of ordinary intelligence must guess the meaning of Section 231(a)(3) because it is replete with vague and imprecise terms. The statute provides:

> Whoever commits or attempts to commit *any act to obstruct, impede, or interfere* with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties *incident to and during the commission of a civil disorder* which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

18 U.S.C. § 231(a)(3) (emphases added).

"Any act" can include anything from protected free speech and expressive conduct to an egregious assault. Further, "to obstruct, impede, or interfere," contains the identical and improper vagueness as 18 U.S.C. § 1512, which is discussed above. The most problematic part of the statute, however, is how to decipher what "incident to and during the commission of a civil disorder" means. The statute defines "civil disorder" as:

> Any public disturbance involving acts of violence by assemblages of three or more persons which causes an immediate danger of or results in damage or injury to the property or person of any other individual.

18 U.S.C. § 232(1). However, the statute fails to instruct whether a defendant must have participated in that civil disorder and/or how physically close a defendant must be for the conduct to count as "incident to." Lastly, the statute ends again with the vague words, "in any way obstructs, delays, or adversely affects commerce." This phrase opens the door for endless subjectivity over (1) what constitutes obstruction and/or delay, and (2) what does or does not constitute an "adverse effect," and (3) what is sufficiently material "affect upon commerce" to fall within the proscription of the statute.

Unsurprisingly, a South Carolina ordinance with similar language was found unconstitutionally vague in *McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 554 (D.S.C. 2013). That ordinance made it unlawful "for any person to interfere with or molest a police officer." *Id.* Like that ordinance, § 231 (a)(3) "includes no objective standard to guide the police in determining that conduct constitutes unlawful interference…." *Id.* Because there is no standard to provide such guidance, the statute "authorizes, if not encourages, discriminatory enforcement." *Id.* Similarly, the language of § 231(a)(3) includes the word "interfere" and there is no standard to guide law enforcement to discern what the word means. Furthermore, the neighboring words in the statute do not make the ambiguous words any clearer; if anything, the other words of the statute increase the confusion.

As discussed above with the vagueness of § 1512(c)(2)'s "residual clause," § 231(a)(3)'s language requires courts to undertake an indeterminate, "wide-ranging inquiry" that denies defendants fair notice and encourages arbitrary enforcement. *Johnson v. United States*, 576 U.S. 591, 597 (2015). Moreover, it provides no clearly articulated nexus between the act and the "civil disorder." And while § 232(1) provides a definition of "civil disorder," its definition could apply to virtually any tumultuous public gathering involving more than two people. Because the statute invites the same kind of unwieldy judicial assessment struck down in *Johnson*, § 231(a)(3) similarly should be held invalid.

Furthermore, by enacting a statute with such imprecise language, Congress created "a criminal prohibition of alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010). In *Hill*, the Court found that an ordinance's sweeping nature was neither "inevitable" nor "essential to maintain public order." 482 U.S. at 464. Because the ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words," it wrongly gave police "unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Id.* at 465. Similarly, here, § 231(a)(3) casts far too wide a net. By expansively encompassing "any act" that could interfere with the duties of a police officer or firefighter during a civil disorder, § 231(a)(3) is not limited to "violent acts" or acts that result in bodily injury or that otherwise put persons or property in imminent danger. C.f. *United States v. Reese*, 92 U.S. (2 Otto) 214, 221 (1876) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."). Moreover, the statute does not weed out those acts with protected expressive content or those that occur in a traditional public forum. Instead, § 231(a)(3) reaches a substantial amount of expressive conduct, and without clear boundaries, the law chills free speech and invites discriminatory application by law enforcement and the government.

### b. Section 231(a)(3)'s Reliance on Subjective Reactions Renders Violations Unpredictable

Section 231(a)(3) also impermissibly requires individuals to predict how others will react to their conduct. If they fail to predict that reaction accurately, they risk violating the law. This violates the fair notice requirement under the Due Process Clause. For example, in *Coates v. City of Cincinnati*, 402 U.S. 611 (1971), the Supreme Court struck down a statute that criminalized conduct "annoying to persons passing by." *Id.* at 614. The Court reasoned that, while the city was "free to prevent people" from criminalizing certain enumerated conduct, such as "blocking sidewalks" or "littering streets," it could not enforce "an ordinance whose violation may entirely depend on whether or not a policeman is annoyed." *Id.* Similarly, in *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Supreme Court invalidated a statute that prohibited loitering "with no apparent purpose." *Id.* at 60. The Court observed that it was "difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose." *Id.* at 57.

Here, as in *Coates* and *Morales*, it is similarly difficult to imagine how an individual could predict the potential consequences of each act he/she commits that is somehow "incident to or during," a "civil disorder." Indeed, § 231(a)(3) triggers criminal liability whenever the defendant's conduct interferes or impedes with a fireman or police officer performing his official duties. But a gesture, sign, or other act that distracts one officer and makes him/her feel impeded or interfered with, could have no impact at all on another. Moreover, the individual's "act" may be "incident to and during" a civil disorder that he/she is not involved in at all.

These subjective standards leave much discretion of police and prosecutors to determine whether a particular individual's conduct violates the law and means that a potential defendant is not provided with fair and sufficient notice of what constitutes unlawful behavior. Due to this lack of predictability and precision, § 231(a)(3) violates the fair notice requirement.

### c. Section 231(a)(3) Lacks a Scienter Requirement, Which Weighs in Favor of the Law's Unconstitutionality

The Court has repeatedly affirmed that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests.* at 499. But here, there is no such mitigation, because Section 231(a)(3) contains no scienter requirement, thus creating "'a trap for those who act in good faith.'" *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)). This absence weighs in further favor of the statute's unconstitutionality.

Additionally, where, as here, individuals must balance multiple factors, and are subject to strict criminal liability when they balance those factors incorrectly, a statute should be held unconstitutional. *See Colautti*, 439 U.S. at 380-95. In *Colautti*, a Pennsylvania statute required physicians to weigh several variables to determine fetus viability. *Id.* If the physician made the wrong determination after weighing these variables, the statute imposed strict criminal liability. *Id.* at 395. The Court struck down the statute, reasoning that "[t]he perils of strict liability [were] particularly acute . . . because of the uncertainty of the viability determination itself." *Id.*

Here, individuals like Mr. Pastucci and Ms. Mangia seeking to exercise their First Amendment rights in political protest must balance several factors. They must consider whether they are sufficiently "incident to" a group of two or more people in a situation amounting to a "civil disorder," whether police or firemen are in the vicinity, and whether "any" of their acts could interfere with "any" police officer's duties, as determined by that officer. If the wrong determination(s) are made, even in good faith, he/she is now subject to criminal liability. To the extent that a scienter requirement is read into the statute, this does not cure the fair notice issue. Instead, this merely leaves police, prosecutors, and judges to decide after the fact whether the statute requires knowledge (and if so, of what) or specific intent (and if so, to do what). Here, the Defendants lacked fair notice of what conduct would violate the law without a scienter requirement in § 231(a)(3).

### III.    Counts 4, 5, 6, 7, 8, 9, 10, and 11 Violate the Double Jeopardy Clause

Convictions for Counts 4, 5, 6, 7, 8, 9, 10, and 11 would violate the Double Jeopardy Clause of the U.S. Constitution. Multiplicity arises when "an indictment charges the same offense in more than one count." *United States v. Mahdi*, 598 F.3d 883, 887 (D.C. Cir. 2010), quoting *United States v. Weathers*, 186 F.3d 948, 951 (D.C. Cir. 1999). The Double Jeopardy Clause of the Constitution protects against "multiple punishments for the same offense." *Weathers*, 186 F.3d at 951, *cert. denied*, 529 U.S. 1005 (2000); U.S. Const. amend. V, cl. 2.

Also, courts have recognized that charging the same offense in multiple counts can "unfairly increas[e] a defendant's exposure to criminal sanctions" because a jury may conclude that given the number of charges, the defendant must be guilty of something. *United States v. Clarke*, 24 F.3d 257, 261 (D.C. Cir. 1994), quoting *United States v. Harris*, 959 F.2d 246, 250 (D.C. Cir. 1992), *abrogated on other grounds*, *United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001); *see also United States v. Morrow*, 102 F. Supp. 3d 232, 246 (D.D.C. 2015) (multiplicitous charges may suggest to a jury "that a defendant has committed not one but several crimes"), quoting *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981); *United States v. Phillips*, 962 F. Supp. 200, 202 (D.D.C. 1997).

The subject eight counts of the Indictment expose the defendants to double, and even triple jeopardy for the same alleged acts. The Double Jeopardy Clause protects criminal defendants against both successive punishments and prosecutions for the same criminal offense. *United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969)); *see also United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008); *United States v Mancuso*, 718 F.3d 780, 791 (9th Cir. 2013). When two different criminal statutes are violated, "the double jeopardy prohibition is implicated when both statutes prohibit the same offense or when one offense is a lesser included offense of the other." *Rutledge v. United States*, 517 U.S. 292, 297 (1996)).

## CONCLUSION

**WHEREFORE**, Defendants, Joseph Pastucci and Jeanette Mangia respectfully request this Honorable Court grant this motion for all of the reasons mentioned above and dismiss Counts 1, 2, 4, 5, 6, 7, 8, 9, 10, and 11 of the Indictment.

Defendants' counsel sought concurrence on this motion with Sean McCauley, Esquire, U.S. Attorney's Office, and said concurrence was denied.

Defendants, by counsel, request a hearing on this motion.

Respectfully submitted,

**ABOM & KUTULAKIS, LLC**

Date:  February 8, 2024          _____/s/_____
                                 Stephanie L. Cesare, Esquire
                                 2 West High Street
                                 Carlisle, PA  17013
                                 (717) 249-0900
                                 Attorney ID No. 308102

**The Orenberg Law Firm, LLC**

Date:  February 8, 2024          _____/s/_____
                                 Allen H. Orenberg, Esquire
                                 12505 Park Potomac Avenue, 6th Floor
                                 Potomac, MD  20854
                                 (301) 984-8005
                                 Attorney ID No. 395519

## <u>CERTIFICATE OF SERVICE</u>

AND NOW, this 8th day of February, 2024, I, Stephanie L. Cesare, Esquire, of ABOM &

KUTULAKIS, L.L.C. hereby certifies that I did serve a true and correct copy of the foregoing Joint

Motion to Dismiss via ECF to all case registered parties.

Date: February 8, 2024

_____/s/_____
Stephanie L. Cesare, Esquire
2 West High Street
Carlisle, PA  17013
(717) 249-0900
Attorney ID No. 308102